IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22-CR-336 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| PAYNE ET AL., | ) | <u>TRIAL BRIEF</u> |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through counsel, Rebecca C. Lutzko, United States Attorney, and Jason W. White, Special Assistant United States Attorney, and hereby submits the following trial brief.

## I.    Statement of the Case.

On June 23, 2022, a grand jury returned a six-count indictment charging the following individuals with the following crimes:

| COUNT | OFFENSE | STATUTE | DEFENDANT(S) |
|---|---|---|---|
| 1 | Conspiracy to Commit Bank Fraud | 18 U.S.C. § 1349 | Elijah S. Payne<br>William D. Saunders<br>Cameron J. Proctor<br>Maurice A. Mowler<br>Antoine R. Whitsett<br>Tyrone Williams |
| 2 | Conspiracy to Commit Bank Fraud | 18 U.S.C. § 1349 | William D. Saunders<br>Tavion L. Bolden<br>Latrent M. Redrick<br>Janiya M. N. Smith<br>Lady M. Walker<br>Tyrone Williams |
| 3 | Conspiracy to Commit Bank Fraud | 18 U.S.C. § 1349 | Rashawn Creer |
| 4 | Possession of Stolen Mail | 18 U.S.C. § 1708 | Elijah S. Payne |
| 5 | Bank Fraud | 18 U.S.C. § 1344(2) | Elijah S. Payne |
| 6 | Theft of Mail by a Postal Employee | 18 U.S.C. § 1709 | Cameron J. Proctor |

As of August 23, 2023, PAYNE, SAUNDERS, PROCTOR, REDRICK, and SMITH have pleaded guilty.  WILLIAMS is expected to plead guilty on August 24, 2023.  A trial for the remaining defendants is scheduled to begin on September 18, 2023 and is expected to last eight days.

**II.    Summary of Case.**

In the October 2021, the United States Postal Service (USPS) discovered several incidences of mail theft in the Cleveland area.  In many of these incidences, the perpetrators stole mail directly from USPS's mail collection boxes.  Around the same time, the USPS and law enforcement agencies received reports of checks being altered and cashed that had previously been placed in USPS custody to be mailed.

As law enforcement agencies investigated these cashed checks, they discovered similarities in the methods of effectuating the scheme and connections to the mail theft reports.  Through interviews, a review of the defendants' social media accounts, analysis of text message exchanges, execution of search warrants, and other investigative techniques, law enforcement officers uncovered multiple conspiracies in which the defendants exchanged stolen and altered checks, recruited others, cashed them, and obtained the proceeds.

As alleged in Count 1, PAYNE, SAUNDERS, PROCTOR, MOWLER, WHITSETT, and WILLIAMS conspired together and with others known and unknown to cash these stolen and altered checks with the intent to defraud the financial institutions from which the checks were drawn.  Much of the evidence of the conspiracy is contained in social media and text messages exchanges between the co-conspirators.  More specifically, in early November 2021, PAYNE and SAUNDERS communicated via Instagram direct message in which PAYNE admitted to

unlawfully accessing USPS mail collection boxes. SAUNDERS requested to buy four checks in order to cash them and receive the proceeds.

In December 2021, PAYNE contacted WILLIAMS and requested information about how to obtain stolen checks from the mail. WILLIAMS responded that he would connect PAYNE to PROCTOR, a USPS employee. Evidence collected by law enforcement agencies confirmed that PROCTOR stole mail in his custody and transferred it to his co-conspirators. Additionally, at the same time of the conspiracy, keys that USPS employees use to access mail collection boxes were missing from PROCTOR's letter carrier route.

Later in December 2021, PROCTOR texted MOWLER and offered him a mail collection box key and ten checks for sale for $3,500. MOWLER expressed confidence that he and his co-conspirator would accept the deal. PROCTOR also offered a mail collection box key and stolen checks to WILLIAMS. PROCTOR also offered two stolen checks to WHITSETT, who agreed to meet up and make the transaction.

In January 2022, SAUNDERS sent an Instagram direct message to WHITSETT asking for stolen checks. WHITSETT agreed to meet SAUNDERS and provide him with stolen checks in exchange for money.

On at least two separate occasions as alleged in the indictment, checks that had been stolen from the mail were cashed. A search warrant executed on PAYNE's apartment revealed hundreds of stolen mail items and checks.

As alleged in Count 2, SAUNDERS, BOLDEN, REDRICK, SMITH, WALKER, and WILLIAMS also conspired together and with others known and unknown to cash stolen and altered checks with the intent to defraud the financial institutions from which the checks were drawn. In December 2021, SMITH indicated to REDRICK that she had two PNC Bank accounts

available to use to cash stolen and altered checks. SMITH agreed to provide REDRICK the log-in information for these accounts. Later that month, SMITH defrauded PNC bank by depositing a $3,784.45 check drawn on N.O.H.S.'s account. SMITH agreed with co-conspirator R.M. that R.M. would take $700 of the proceeds with SMITH retaining the rest.

Around the same time, WALKER cashed a $4,034.59 check drawn on N.O.H.S.'s US Bank account with co-conspirator S.W. An employee for N.O.H.S. mailed this check at the same time the employee mailed the SMITH check. A conversation between WALKER and S.W. revealed they had agreed that S.W. would receive $2,000 while WALKER would retain the remainder of the stolen funds.

As alleged in Count 3, CREER and an unindicted co-conspirator, A.A., agreed to defraud Citizens Bank by cashing a $25 check drawn on J.W.'s account but altered to $10,000. CREER advertised his scheme using his Instagram account by posting a story to recruit co-conspirators. A.A. responded to the story and provided CREER his log-in information to his bank account. CREER directed A.A. to transfer $200 to him after the check cleared.

### III. Controlling Law.

In Counts 1 through 3, the defendants are charged with Conspiracy to Commit Bank Fraud, in violation of Title 18, United States Code, Sections 1344 and 1349. The prosecution must prove each and every one of the following elements beyond a reasonable doubt:

(A) First, that two or more persons conspired, or agreed, to commit the crime of bank fraud, and

(B) Second, that the defendant knowingly and voluntarily joined the conspiracy.

Sixth Circuit Pattern Jury Instruction 3.01A, 2023 Edition.

Of particular importance in this case is what the law does not require. The law does not require proof that any formal agreement, written or spoken. Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 3.02. The law does not require proof that everyone involved agreed on all the details, that a defendant knew everything about the conspiracy and every other member of the conspiracy, or that he or she was a member of it from the beginning. Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Sections 3.02 and 3.03. Nor does the law require the defendant to play a major role in the conspiracy or that his or her connection to it was substantial. Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 3.03. Finally, the law does not require proof of an overt act. *United States v. Rogers*, 769 F.3d 372, 382 (6th Cir. 2014) (holding that conspiracy under 18 U.S.C. § 1349 does not require an overt act).

What is "essential" is that the prosecution prove that there was a "mutual understanding, either spoken or unspoken, between two or more people, to cooperate with each other to commit the crime of bank fraud." Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 3.02. A slight role or connection to the conspiracy may be enough for a conviction. Sixth Circuit Pattern Criminal Jury Instructions, 2023 Edition, Section 3.03.

IV. **Evidentiary Issues.**

   A. <u>Admission of Defendants' Statements When Offered by the Prosecution.</u>

The United States intends to admit some of the defendants' out-of-court statements for the truth of the matters asserted. Those statements include the defendants' statements in consensual recordings, social media and text messages, and statements made in their non-custodial interviews.

5

Out-of-court statements made by a party-opponent are excluded from the definition of hearsay under Rule 801(d)(2), but this exception does not apply when the same statements are offered by the party himself. The party-opponent exception reflects the fact that the adversarial process allows the party-declarant to rebut his own admissions by testifying at trial. *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). This exception does not, however, extend to a party's attempt to introduce his own statements through the testimony of other witnesses. *See United States v. Payne*, 437 F.3d 540, 547-48 (6th Cir. 2006). Precluding a defendant from eliciting inadmissible hearsay statements does not violate the Confrontation Clause. *See United States v. Ford*, 761 F.3d 641 (6th Cir. 2014).

Therefore, the United States respectfully requests that the Court prohibit the defendants from introducing any of their out-of-court statements at trial through any witness other than himself.

    B. <u>Admission of Out-of-Court Co-Conspirator Statements.</u>

As with the defendants' own statements, their co-conspirator's out-of-court statements are, when offered by the United States, not hearsay. *See* Fed. R. Evid. 801(d)(2)(E). The United States intends to offer the conversations between co-conspirators as co-conspirator statements under this Rule. A statement falls within the Rule 801(d)(2)(E) co-conspirator exclusion if the prosecution shows "(1) that a conspiracy existed, (2) that the defendant was a member of the conspiracy and, (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." *See United States v. Wright*, 343 F.3d 849, 866 (6th Cir. 2003) (citation omitted); *United States v. Benson*, 591 F.3d 491, 502 (6th Cir. 2010) (same).

The Court determines whether the prosecution has proved these facts by a preponderance of the evidence under Federal Rule of Evidence 104(a). *See United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000). Accordingly, the Court "may consider hearsay" and other non-

privileged evidence that would otherwise be inadmissible. *Bourjaily v. United States*, 483 U.S. 171, 178 (1987). The Court may even consider the "statements sought to be admitted" under Rule 801(d)(2)(E), *id.* at 181, though the prosecution must provide "sufficient independent and corroborating evidence" of the conspiracy, *United States v. Smith*, 320 F.3d 647, 654 (6th Cir. 2003). There is no set procedure for ruling on the admissibility of the statements, but courts in this Circuit commonly "admit the hearsay statements subject to a later ruling that the government has met its burden." *See id.*

These co-conspirator statements do not implicate any Confrontation Clause concerns because these recorded statements are not testimonial in nature. Rule 801(d)(2)(E) co-conspirator statements are "categorically non-testimonial and also within a 'firmly rooted' exception to the hearsay rule. Therefore, the Confrontation Clause does not bar their admission." *United States v. Tragas,* 727 F.3d 610, 615 (6th Cir. 2013) (internal citations omitted).

Finally, many of these statements are not hearsay because they will be offered not for the truth of the matter asserted, but to show the co-conspirators' knowledge, intent, or state of mind. Accordingly, to the extent co-conspirator statements are offered for the truth of any matter asserted, the United States submits that the Court should admit these statements pursuant to Rule 801(d)(2)(E).

C. <u>Prosecution Witness Testifying Pursuant to Plea Agreement.</u>

The United States is entitled to elicit from witnesses who have plead guilty the contents of their plea agreements for the purpose of allowing the jury to assess credibility. The Sixth Circuit has held that the United States may elicit the contents of a plea agreement from a witness on direct examination in anticipation of potential cross-examination and in order to afford the jury a better opportunity to evaluate the witness's credibility. *See United States v. Townsend*,

796 F.2d 158, 162-63 (6th Cir. 1986); *United States v. Walker*, 871 F.2d 1298, 1303 (6th Cir. 1989).  Such testimony is permissible so long as it is not offered as substantive evidence of the defendant's guilt.

    D.  <u>The Jury Should Not be Informed of the Consequences of its Verdict.</u>

If convicted in this case, the defendants face possible terms of imprisonment, fines, and multiple restitution orders.  The defendants may endeavor to educate the jury on the potential ramifications of a guilty verdict in this case with the hope of obtaining jury nullification.  Defendants often infuse sentencing into the trial under the guise of cross-examining a cooperating witness.  For example, a defendant may ask the witness about the maximum penalty for the charged offense, may compare a cooperator's plea agreement to the defendant's status, or use the cooperator to contrast a defendant's perceived situation, i.e., "You pleaded guilty because you didn't want a trial to bankrupt you, cause family strain, etc."

The Sixth Circuit has firmly rejected such a strategy: "[U]nless juries have roles in sentencing, such as in capital sentencing proceedings, juries should be instructed not to consider defendants' possible sentences during deliberation."  *United States v. Chesney*, 86 F.3d 564, 574 (6th Cir. 1996).  *See also United States v. Stotts*, 176 F.3d 880, 886 (6th Cir. 1999) ("the Supreme Court has held that juries should be instructed not to consider a defendant's possible sentence unless the jury has a specific role in sentencing").  The Supreme Court explained the reasoning behind insulating the jury from possible penalties in a case.

> The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury.  The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged.  The judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict.  Information regarding the consequences of a verdict is therefore irrelevant to the jury's task.  Moreover, providing jurors sentencing

8

> information invites them to ponder matters that are not within their
> province, distracts them from their factfinding responsibilities, and
> creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579 (1994). Accordingly, Defendant should not be permitted to distract and confuse the jury by inviting the jury to decide the issue of guilt with the knowledge of this Court's sentencing options or the applicable guidelines range.

    E.  <u>Reciprocal Discovery and Affirmative Defenses.</u>

The United States requested reciprocal discovery from the defense but has not received any documents thus far in the prosecution of this matter. To the extent that there exists reciprocal discovery to which the United States is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that the defense has not produced, the Government reserves the right to seek to have such materials excluded at trial. *See United States v. Young*, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of prosecution witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

The defendants have not given notice of an intent to rely on any defense of entrapment, mental incapacity, duress, or alibi. Therefore, to the extent the defendants may attempt to rely on any such defense, the United States reserves the right to object and to seek to have the defendants precluded from asserting such defenses.

**V.**    **<u>Courtroom Procedure</u>**

    A.  <u>*Jencks* Material.</u>

The United States will provide *Jencks* material to the defense in a timely manner and in accordance with this Court's Order.

B. <u>Sequestration of Witnesses & Presence of Government Agent at Trial.</u>

The United States respectfully requests that the Court issue a witness-sequestration order pursuant to Federal Rule of Evidence 615. The United States designates Postal Inspector Fabricio Leite of the United States Postal Inspection Service as its representative in this case to be present at counsel table throughout the trial. His presence in the courtroom during trial is essential to the presentation of the prosecution's case. *See* Fed. R. Evid. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); Fed. R. Evid. 615(c) (providing an additional exception for essential witnesses).

                                        Respectfully submitted,

                                        REBECCA C. LUTZKO
                                        United States Attorney

By:   /s/ Jason W. White
        Jason W. White (NY: 4672267)
        Special Assistant United States Attorney
        United States Court House
        801 West Superior Avenue, Suite 400
        Cleveland, OH 44113
        (216) 622-3874
        (216) 522-8355 (facsimile)
        Jason.W.White@usdoj.gov