IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:22-CR-336 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID A. RUIZ |
| | ) | |
| v. | ) | |
| | ) | |
| ELIJAH S. PAYNE, | ) | GOVERNMENT'S SUPPLEMENTAL |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |

The United States of America, by and through its counsel of record, the United States Attorney for the Northern District of Ohio, hereby files its supplemental sentencing memorandum for defendant Elijah S. Payne to address Payne's *Loper Bright* argument and to provide its sentencing recommendation. The United States contends that *Loper Bright* does not affect this Court's consideration of intended loss and recommends that this Court sentence Payne to a term of imprisonment to last between 33 and 41 months based upon the stipulated total offense level of 20. The United States contends that the sentence recommended herein is sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a) where the defendant conspired to obtain and cash checks stolen from the United States Postal Service (USPS) and thereby enriched the members of the conspiracy.

### *LOPER BRIGHT* DOES NOT AFFECT THIS COURT'S CONSIDERATION OF INTENDED LOSS.

In his supplemental sentencing memorandum, Payne argues that this Court should not consider intended loss. He argues that the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, ___ U.S. ___ (2024), which ended *Chevron* deference, restricts this

Court from deferring to the Sentencing Commission's interpretation of its own regulation. However, the deference which the Sixth Circuit used to allow for the consideration of intended loss was not the same addressed in the *Loper Bright* decision. Prior Sixth Circuit decisions used *Auer* deference as applied and approved of in *Kisor v. Wilkie*, 588 U.S. 558 (2019) to direct a district court to consider intended loss, not *Chevron*. *See United States v. You*, 74 F.4th 378, 397-98 (6th Cir. 2023), *United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *4-6 (6th Cir. Aug. 3, 2023), *United States v. Smith*, 79 F.4th 790, 797-98 (6th Cir. 2023).

In *Loper Bright*, the Supreme Court ended *Chevron* deference which required that a federal court defer to an agency's interpretation of a statute that the agency administers if the underlying statute is unclear, and the agency's interpretation is deemed reasonable. *Loper Bright Enterprises v. Raimondo,* ___ U.S. ___ (2024). *Auer* deference applies when an agency interprets its own ambiguous rules, such as here when the Sentencing Commission interprets its Guideline provisions by way of its commentary. *Kisor*, 558 U.S. at 558.

The Seventh Circuit recognized the difference between *Chevron* and *Auer* post-*Loper Bright* as it is applied to the intended loss analysis in *United States v. Ponle*, No. 23-2404, 2024 WL 2643388 (7th Cir. Aug. 5, 2024). In *Ponle*, several conspirators used phishing emails and information purchased on the dark web to gain access to corporate email accounts. *Id.* at *1. The district court found that the conspirators successfully stole over $8 million dollars but intended to steal an additional $51 million. *Id.* The Seventh Circuit endorsed the district court's utilization of intended loss at sentencing after noting that the Guideline commentary was authoritative under the Supreme Court's decision in *United States v. Stinson*, 508 U.S. 36 (1993) and that fact was not modified by *Kisor*. *Id.* at *3. In a footnote citing *Loper Bright*, the Seventh

2

Circuit made clear, "*Auer* deference . . . (it should be noted) is different from *Chevron* deference." *Id.* at footnote 3.

Because the Sixth Circuit used the *Kisor* framework to endorse the consideration of intended loss in calculating a defendant's Guidelines range, *Loper Bright* affords Payne no relief. The precedent set forth in *You*, *Kennert*, and *Smith* stands, and this Court should consider the conspirator's intended loss in fashioning its sentence.

### THE GOVERNMENT RECOMMENDS A GUIDELINE SENTENCE.

Based on all of the information before the Court, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment of between 33 and 41 months as prescribed by the Sentencing Guidelines, a three-year term of post-release supervision, and an order to pay restitution as outlined below. The government submits that the recommended sentence adequately reflects the statutory factors to be considered under 18 U.S.C. § 3553(a) in imposing a sentence, particularly:

(1) the nature and circumstances of the offense and the characteristics of the defendant;

(2) the need for the sentence imposed—

  (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

  (B) to afford adequate deterrence to criminal conduct;

  (C) to protect the public from further crimes of the defendant; [and] . . .

(7) the need to provide restitution to any victims of the offense.

**A. The Nature, Circumstances, and Seriousness of the Offense and the Need to Provide Just Punishment.**

Payne's offense is extremely serious both in the expansive scope of his criminal enterprise and the tremendous harm that his criminal conduct caused. A serious crime like the

3

one here requires that a just punishment be imposed. Accordingly, a sentence within the Guideline range of 33-41 months is warranted here.

First, Payne's criminal conduct proved to be the most prolific of the co-conspirators in terms of the number of checks and the potential monetary loss to the victims. When law enforcement officers searched Payne's apartment, they found 290 stolen checks with a face value of over $2.9 million dollars. Additionally, agents found 98 stolen money orders with a face value of over $14,000. When agents executed a search warrant for Payne's backpack, they found an additional 41 stolen checks with a face value of over $125,000, a United States Treasury check for $273, and eleven money orders in the amount of $1,817.96. In Payne's vehicle, law enforcement officers found piles of unopened stolen mail and a collection box key which allowed him free reign to access more postal collection boxes and more mail.

Payne's criminal conduct was not limited to the face value of these checks, however. Through their investigation, agents learned that Payne created new fraudulent checks using the banking information found on the stolen checks. Agents found blank check paper in his apartment and in his backpack which was used to manufacture these fraudulent checks. Agents found check-making software on his computer which allowed him to manipulate the information he obtained into checks that were identical to the real checks except for the amount and payee. With the ability to manufacture new fraudulent checks, the amount of financial harm Payne could cause was only limited by his imagination.

In order to maximize the revenue generated by his scheme, Payne recruited others to help. When agents reviewed Payne's social media, they found that he actively recruited others to join and participate in his criminal operation. In direct messages, Payne often referred to some of these co-conspirators like they were his employees, calling them "my worker" or "my driver"

4

when describing the picking up and dropping off of checks and bank cards. Payne actively sought out United States Postal Service employees to further expand his operation, which he eventually found in co-defendant Cameron Proctor. As evidenced through his communications, Payne treated fraudulent checks, banking information, and collection box keys as commodities to buy and sell for his own personal profit. Payne's criminal enterprise proved to be expansive and complex which warrants a Guideline sentence.

The seriousness of Payne's offense is further exacerbated by the harm that he caused. First, Payne and his co-conspirators victimized a large number of individuals who resided throughout Northeast Ohio and beyond. Payne and his co-conspirators committed this offense during the holiday season when many of his victims were mailing holiday cards and gifts which were never delivered. As is clear from the victim impact statements, many of these victims lost money directly from their bank accounts. Many of these victims faced late payment fees for bills that they sent but were never received.

In addition to the victim account holders, Payne and his co-conspirators harmed the Postal Service and the communities of Northeast Ohio. When a person places a mail item into the care of the Postal Service, they trust that the Postal Service will deliver it to where it needs to go. Whether it's a holiday card to a friend or family member or a payment for a bill, the community depends on the Postal Service to fulfill its promise that it will deliver these items. Through their acts, Payne and his co-defendants eroded that trust that the community has with the Postal Service. As a result of their conduct, the Postal Service was forced to close collection boxes in a number of communities, forcing people to only mail items inside post offices during business hours. Additionally, law enforcement agencies were inundated with reports of missing

mail, stolen checks, and compromised bank accounts. The harm Payne and his co-conspirators caused to these victims and the community deserves a Guideline sentence.

**B. Characteristics of the Defendant.**

Both during the commission and the offense and after the indictment was returned, Payne has shown little regard for those who he had victimized or an appreciation of the severity of crimes that he committed. During the time he perpetrated his criminal scheme, Payne routinely flaunted his expensive jewelry, including one piece shaped as an ATM, extravagant travel, and high-end vehicles on his social media. Payne also advertised his criminal scheme on social media to others as a means to make easy money, all on the backs of those he victimized.

Payne also continued to commit crimes even as this current case was pending. On November 4, 2023, Payne entered a Best Buy in Mentor, Ohio and purchased two $400 Best Buy gift cards using a credit card in someone else's name. After Payne left, a Best Buy employee contacted the person who owned the card to inquire whether she authorized the purchase. She did not. That employee then voided the gift cards. Noticing that the gift cards were voided, Payne returned to the Best Buy and was arrested. On his person was another credit card that did not belong to him. Further investigation revealed that the cards were recently reissued, and likely stolen from the mail. This case remains pending, and a change of plea hearing is currently scheduled for August 13, 2024. Payne's bond was revoked as a result of this arrest, and he has been in custody since December 13, 2023.

Furthermore, on March 13, 2024, an individual robbed a letter carrier of a collection box key in Youngstown, Ohio. During the interview, this individual indicated that he had been incarcerated with Payne. During their incarceration, Payne instructed this individual on how to emulate his mail theft and check cashing scheme and connected him with his co-conspirators. In

6

early March 2023, this individual was released from custody.  According to jail call records, there were seven calls between this individual and Payne between March 14, 2024 and March 21, 2024.  On the first phone call, which occurred on the day after the letter carrier was robbed, the individual reported to Payne that he "got that bitch" to which Payne responded, "Everything is about to be everything" and "I got you my guy."  Payne further stated that his "girl" would contact him and "they" would be locked in.  Payne provided the phone number to a co-conspirator and directed him to contact them for further instructions.  Both continued to talk in code and at one point Payne told this individual that he needed to "make sure it works" referencing the collection box key.  The individual asked Payne "what should I do?" and "just go test?"  Payne told the individual, "remember how I used to tell you how to do it?"  Payne then appeared frustrated saying "damn gang" as he attempted to coach the individual what to do with the collection box key while trying not to say too much to incriminate himself.  They communicated further about Payne's associates helping this individual.

On March 19, 2024, Payne called the individual and told him he "can't take her on a date in Cleveland," "her" being a reference to the collection box key, and that "he has to take her on a date out here" referencing the Youngstown, Ohio area.  Payne was referring to the fact that collection box keys can only open collection boxes within a certain Zip Code.  Payne understood that the collection box key taken on March 13, 2024 could not be used in Cleveland, but only in the Youngstown area.  Payne then continued to instruct in code with the individual about the check fraud scheme.  Based on the contents of these jail calls, it is clear that Payne attempted to continue his criminal enterprise while being incarcerated on the instant charge.

**C. The Need to Provide Restitution.**

The United States respectfully requests that the Court order restitution to be paid as follows which represents the amounts that can be directly attributable to Payne:

| Victim | Amount |
|---|---:|
| Lazzaro Luka Law Offices | $9,336.71 |
| Michael Coyne | $15,000.00 |
| Barbara Rozier | $4,600.30 |

## CONCLUSION

As the Court considers the factor set forth in §3553(a), the United States contends that Payne's offense is serious because of both the breadth of his criminal conduct and the immense harm that he caused. Furthermore, Payne brazenly flaunted his ill-gotten gains and continued his criminal behavior even after being arrested on the instant charges. For those reasons, the United States submits that a sentence within the Guideline range of 33-41 months is sufficient but not greater than necessary to fulfill the goals of §3553(a).

    Respectfully submitted,

    REBECCA C. LUTZKO
    United States Attorney

By:   /s/ Jason W. White
    Jason W. White (NY: 4672267)
    Special Assistant United States Attorney
    United States Court House
    801 West Superior Avenue, Suite 400
    Cleveland, OH 44113
    (216) 622-3874
    (216) 522-8355 (facsimile)
    Jason.W.White@usdoj.gov